
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 7, 2017

## MICHAEL CLARK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 07-04686        Chris Craft, Judge

_____

## No. W2016-01013-CCA-R3-PC

_____

Michael Clark ("the Petitioner") was indicted for second degree murder and attempted second degree murder in a single indictment. In his first trial, the Petitioner was convicted of attempted second degree murder, and a mistrial was declared as to the charge of second degree murder. In the second trial, the Petitioner was convicted of the lesser-included offense of voluntary manslaughter. The Petitioner was sentenced to twenty years as a multiple offender for attempted second degree murder and to fifteen years as a persistent offender for voluntary manslaughter to be served consecutively. The Petitioner filed a single petition for post-conviction relief alleging that he received the ineffective assistance of counsel in both trials, which the post-conviction court denied following a hearing. On appeal, the Petitioner argues that his claims of ineffective assistance of counsel during his first trial are properly before this court, that first and second trial counsel's representations were deficient, and that he was prejudiced by those deficiencies. After a thorough review of the record and applicable case law, we affirm the post-conviction court's denial of relief from the judgment entered in the second trial and dismiss the Petitioner's appeal related to the judgment entered in the first trial because the petition was not filed within one year of the date our supreme court denied the application for permission to appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed, in part; Judgment of the
Criminal Court Affirmed, in part**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, Michael Clark.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

The facts underlying the Petitioner's convictions were summarized by our court in his second direct appeal as the following:

Callie Redmond, the victim Antonio Redmond's mother, testified that her son died on September 10, 2006, at the age of twenty-eight.

[M.F.[1]] testified that he was eight years old at the time of the shooting and was at his great-grandmother's house on Winnona Avenue in Memphis when it happened. As [M.F.] was in the front yard playing with other children from the neighborhood, he saw the [Petitioner] fire a gun and heard four gunshots. [M.F.] was not sure where the [Petitioner] lived but recalled having seen him at the house next door to his great-grandmother's before.

[M.F.] testified that, prior to the shooting, he saw a man drive up to the house next door to his grandmother's, get out of the car, and talk to someone at the house. [M.F.] could not discern what was said between the man and the person at the house and could not tell if they were arguing. Once the man returned to the car, the [Petitioner] approached, the two spoke for a few minutes, and then [M.F.] heard gunshots. [M.F.] recalled that the [Petitioner] had a gray or silver gun, but he did not see anyone in the car with a gun. After the shooting, the car departed quickly with its windows broken out, but [M.F.] did not see where the [Petitioner] went.

[M.F.] testified that he talked to the police at both his grandmother's and great-grandmother's houses and told them what he had witnessed. When the police showed him a photographic array, [M.F.] identified the [Petitioner] as the man he saw shooting.

---

[1] It is the policy of this court to refer to minors by their initials. We intend no disrespect.

On cross-examination, [M.F.] acknowledged that he told the police that, when the man got out of the car and approached the house, the man initially called to one of the girls and she talked to him briefly before her grandmother came outside and started arguing with the man. However, [M.F.] clarified that the girl's grandmother and the man were not arguing, they were talking. [M.F.] admitted that he also told the police that, when the [Petitioner] came walking up the street, he and the other man, who was already back in the car, began to argue. However, at the time of trial, [M.F.] did not recall seeing the men arguing, only talking, even after being shown his statement to police. When asked about his testimony at an earlier hearing, [M.F.] acknowledged having testified that the men were arguing outside on the sidewalk, and then he testified that the men were in fact arguing.

[M.F.] testified that he actually saw the [Petitioner] fire a gun and that the [Petitioner] was standing on the passenger side of the car near the front door. [M.F.] recalled that he heard three or four shots before the car drove away. When the gunfire began, [M.F.] ran to his grandmother's house, upon the direction of his grandfather who was also outside.

On redirect examination, [M.F.] testified that he could not hear what the two men were saying. He also testified that the gunshots were fired in quick succession and that the car had begun to drive off by the time [M.F.] started running inside.

Officer Kevin Baker with the Memphis Police Department testified that he heard about the incident on Winnona Avenue around 1:45 or 1:50 in the afternoon of September 10, 2006. As he was traveling south on Hollywood Street en route to the scene of the shooting, he saw what appeared to be a car accident in which the rear of the car was resting on a pole on the sidewalk. When Officer Baker and other officers converged on the scene, they saw two people in the car—one who was sitting in the car, moaning, and the other with his feet in the car but his back on the pavement outside. Officer Baker could tell that the man on the ground was "in bad shape," but he did not know the nature of his injuries. He worked to preserve the scene and keep anyone from approaching the car, but he did not speak to either of the accident victims. He did not see any weapons; however, he acknowledged that he was not looking for any.

. . .

- 3 -

Officer Robert Jones with the Memphis Police Department testified that he was among the officers who responded to the scene of the accident on Hollywood Street. The two men in the vehicle advised that they both had been shot. No weapons were collected on the scene, and neither man was armed when he was taken to the hospital. The vehicle was towed and held at the crime scene processing area for the homicide bureau.

Officer Jones testified that he talked to Hall and [Mr. Redmond]. [Mr. Redmond] believed that he was dying and told Officer Jones that he and his friend had been a few blocks away when "he heard a pop, . . . but he got scared and . . . he just took off. He just put his foot on the gas and drove off to try to get away. And the next thing he kn[e]w they ended up there at Hollywood [Street.]"

On cross-examination, Officer Jones testified that he visually looked inside the car and did not see any weapons, shell casings, or bullets. He did not search the area between the accident site and the shooting for weapons. Officer Jones did not know how long it took for an officer to arrive at the accident site following the crash. On redirect, Officer Jones said that the officers formed a barrier around the scene to keep the area secure but, on recross[-examination], acknowledged that there was obviously "a little time" before officers were present to secure the scene.

Marcus Hall testified that he had known the [Mr. Redmond] for at least fifteen years and that the two had been best friends. On September 10, 2006, he and [Mr. Redmond] were driving around North Memphis, and Hall wanted to stop at the home of Rosie Combs, the mother of his ex-girlfriend, Lakeisha Beasley, to retrieve some of his clothes while they were in the area. Hall and Beasley had dated for four or five months but had been broken up for "a couple of weeks."

Hall testified that [Mr. Redmond] drove him to Combs's house on Winnona Avenue, and they pulled up in front of the house with the passenger side, where Hall was sitting, closest to the home. [Mr. Redmond] waited in the car, while Hall got out and asked Beasley's daughter, who was playing outside with other children, if her mother was home. Beasley's daughter told Hall that her mother was not home but that her grandmother was home.

Hall testified that he knocked on the door, and Combs answered, "enraged . . . [and] heated up already." Combs yelled at him, but he did not

- 4 -

yell back. Hall explained to her why he was there, but Combs "was enraged" and would not give him his clothes. The two talked for a couple of minutes in the doorway before [Mr. Redmond] called for Hall to forget about his clothes, and Hall returned to the car. As soon as he got in the car, Hall noticed the [Petitioner] standing next to the front passenger side door. Hall had never seen the [Petitioner] before and was wondering who he was when a gunshot sounded. The [Petitioner] fired four or five shots. The first shot broke out one of the windows. The second shot hit Hall in the back as he stretched over to protect [Mr. Redmond], who was in the driver's seat. Hall fell into the backseat of the car and told [Mr. Redmond] to drive away. Hall remembered that two more shots were fired before they could pull away.

Hall testified that they drove toward Hollywood Street and traveled for a couple of blocks before the car wrecked. Hall lost consciousness after the wreck, and he did not wake up until he was at the hospital where he learned that [Mr. Redmond] had also been shot and had died from his wounds. Photographs of Hall's scar from his gunshot wound were admitted into evidence over defense objection. Hall was in the hospital four or five hours before being released.

Hall testified that the police came and talked to him at the hospital and had him view a photographic array from which he identified the [Petitioner] as the shooter. Hall said that neither he nor [Mr. Redmond] was armed when they went to Beasley's mother's house that day. Hall admitted that he had prior convictions for possession of cocaine with intent to sell in 2002 and possession of marijuana with intent to sell in 2005 and that at the time of trial he again had charges pending for possession of cocaine and marijuana with intent to sell.

On cross-examination, Hall testified that Beasley lived in an apartment when they first started dating but soon after moved into a house on Lucy Avenue where he frequently stayed with her. Beasley's daughter stayed with them sometimes but usually stayed at Combs's house on Winnona Avenue. Hall met members of Beasley's family when they were dating, but he did not know them well or have a relationship with them. Hall had never met the [Petitioner], Beasley's brother.

Hall testified that, by September 2006, he and Beasley were no longer dating and were on bad terms due to Beasley's having contracted a sexually transmitted disease. After Beasley and Hall came to be on bad

terms, Beasley moved in with her mother on Winnona Avenue, and Hall began to try to get his clothes back from Beasley. Earlier in the day of the shooting, Hall and Beasley got into an argument on the phone over his clothes, so when he and [Mr. Redmond] were in the area later, he decided to stop by Beasley's mother's house to try to retrieve them from her even though he did not know whether his clothes were actually there.

Hall testified that, when Beasley's mother, Combs, came to the door, he tried to explain to her that he was there to get his clothes, but "she was cussing as soon as she seen [sic] [him]." He recalled that Combs was "cussing, fussing, real loud" and that she did not invite him inside. He estimated that he was at Combs's door for "a couple of minutes," but he reiterated that "[he] wasn't arguing. She was arguing."

Hall testified that, once he got back into the car, the [Petitioner] immediately appeared at the side of the car. He said that he never said a word to the [Petitioner], as there was no time before the [Petitioner] started shooting. The [Petitioner] did not say anything to him prior to shooting, and he denied telling Officer Patterson that he and the [Petitioner] had gotten into an argument. Hall stated that he did not have a gun that day. Hall admitted that [Mr. Redmond] would still be alive had he called the police to get his clothes back instead of trying to do so himself.

. . .

Lieutenant Ronald Collins, who was assigned to the Memphis Police Department Homicide Bureau at the time of the incident, testified that he was the case officer in charge of the investigation. When he received the case, the [Petitioner] had already been named as a suspect and, despite his efforts to locate the [Petitioner], he was unsuccessful in doing so. Lieutenant Collins was also responsible for transporting evidence to the TBI for analysis. The weapon used to kill the victim was never located.

. . .

Dr. Karen Chancellor, chief medical examiner for Shelby County, testified that she performed the autopsy on [Mr. Redmond] and determined the cause of death to be a gunshot wound to the chest. Her external examination revealed a gunshot entrance wound on the right side of [Mr. Redmond]'s chest under the armpit area. She did not note any soot or stippling around the wound. Dr. Chancellor's internal examination of [Mr.

Redmond] revealed that the bullet passed through [Mr. Redmond]'s right lung, nicked the liver, passed through the heart, and came to rest on the left side of the chest wall.  Toxicology tests indicated that [Mr. Redmond] had probably used marijuana on the day of his death as well as many days prior to his death.

. . .

### [The Petitioner]'s Proof

Officer James Patterson with the Memphis Police Department testified that he responded to the scene of the crash on Hollywood Street on September 10, 2006, and Hall told Officer Patterson that he had been arguing with the person who shot him.  On cross-examination, Officer Patterson stated that the victims had not been allowed to move when he arrived and only a few onlookers were present.  Officer Patterson acknowledged that he did not remember personally talking to Hall and that someone must have said something to lead him to the conclusion that Hall and the person who shot him had been arguing.  Officer Patterson did, however, recall personally talking to [Mr. Redmond], and [Mr. Redmond] told him that he was scared and asked the officer to pray with him.  [Mr. Redmond] also told Officer Patterson that, as he and Hall were pulling off, someone started shooting at them and he did not know why.

Rosie Combs, Lakeisha Beasley's mother, testified that she lived [on] . . . Winnona Avenue on September 10, 2006.  On that date, she was on her way outside to check on her grandchildren when Hall approached her front door, and the two of them began arguing about Hall's clothes.  Hall thought that some of his clothes were at her house, but none were.  She recalled that it was more of an argument than a conversation because Hall was "cursing and stuff saying he kn[e]w his stuff was in my house but I told him wasn't nothing [sic] in my house."  During the argument, Hall was "moving his hand, one of them but one of them he never did move.  He kept it on his side."  The argument moved off the porch to down by the fence near the sidewalk, until the driver of the car honked the horn and Hall got into the car.

Combs testified that the car started to drive away, and her son, the [Petitioner], came from across the street and was talking to her when the car backed up and stopped in front of her house.  Hall then asked the [Petitioner] if he had Hall's clothes, and the two of them started arguing.

As the men were arguing, three or four shots were fired, but Combs did not see who fired the shots. Combs recalled that Hall "was acting real ugly and mean like he wanted to do something" during all the events that led up to the gunshots and that she was afraid for herself and her grandchildren.

On cross-examination, Combs acknowledged that, when the [Petitioner] came across the street after the car Hall was in started to pull away, she told him that Hall was Beasley's ex-boyfriend. Combs said that she could not remember whether she told Lieutenant Collins in her statement on September 11, 2006, about Hall and [Mr. Redmond] driving away and then coming back, and she acknowledged that "[i]t might not be in [her statement]." She also did not recall telling Lieutenant Collins that she was walking back toward the house and the [Petitioner] was walking behind her when the shooting started. She denied telling Lieutenant Collins that she was actually back in the house for five to ten seconds before hearing the shots.

On redirect, Combs stated that she was afraid that Hall was going to hurt her or the [Petitioner] and that Hall threatened the [Petitioner] and the [Petitioner] appeared to be afraid. However, on recross[-]examination, she acknowledged that she never mentioned previously that Hall had threatened the [Petitioner].

The parties entered a stipulation that Marcus Hall had two assault convictions.

*State v. Michael Clark (Clark II)*, No. W2010-02566-CCA-R3-CD, 2012 WL 1378540, at *1-7 (Tenn. Crim. App. Apr. 17, 2012), *perm. app. denied* (Tenn. Oct. 1, 2012). Additionally, we summarized the Petitioner's testimony in our opinion from his first direct appeal as the following:[2]

The [Petitioner] also testified on his own behalf. He testified that he saw two men arguing with his mother in front of his house. He argued with the men in the car and saw what he believed to be a flash of light from the car's passenger side. He did not see a gun but pulled his own gun and fired two times as the car pulled away. He said he was frightened and that he ran.

---

[2] The Petitioner testified at the first trial but not the second trial but the testimony from other witnesses at the first trial was substantially similar to the testimony at the second trial.

He testified that he began carrying a gun after he ended his affiliation with the Gangster Disciples, and he admitted shooting the two victims.

*State v. Michael Clark (Clark I)*, No. W2009-01649-CCA-R3-CD, 2011 WL 300211, at *1 (Tenn. Crim. App. Jan. 21, 2011), *perm. app. denied* (Tenn. May 25, 2011).[3]

At the first trial, the jury convicted the Petitioner of the attempted second degree murder of Marcus Hall, but the trial court declared a mistrial on count one, the second degree murder of Antonio Redmond. *Id.* The trial court sentenced the Petitioner to twenty years in the Department of Correction as a multiple offender. *Id.* On appeal, this court affirmed the judgment of the trial court. *Id.* at *4. Our supreme court denied further review.

The Petitioner was retried on count one of the indictment for the second degree murder of Antonio Redmond. *Clark II*, 2012 WL 1378540, at *1. The Petitioner was convicted of voluntary manslaughter and was sentenced to fifteen years in the Department of Correction as a persistent offender. *Id.* at *7, 9. The trial court ordered this sentence to be served consecutively to the sentence that the Petitioner received for his attempted second degree murder conviction. *Id.* On appeal, this court affirmed the judgment of the trial court. *Id.* at *12. The Tennessee Supreme Court denied further review.

*Post-Conviction Proceedings*

The Petitioner filed a single pro se petition for post-conviction relief on June 4, 2013, challenging both of his convictions. The petition alleged that first trial counsel[4] failed to object when the trial court allowed the jury to deliberate on count two after declaring a mistrial on count one at the first trial and that first and second trial counsel failed to file pretrial motions, failed to prepare a defense, failed to challenge weaknesses in the State's case and to object to discrepancies in the State's proof, and failed to request an instruction based on *Blakely v. Washington*, 542 U.S. 296 (2004). In his amended petition, filed June 26, 2013, the Petitioner additionally alleged that first and second trial counsel failed to properly cross-examine Ms. Redmond, failed to call witnesses in the Petitioner's defense, and failed to argue on the Petitioner's behalf at the sentencing

---

[3] We note that this case has been designated "not for citation" by the Tennessee Supreme Court. However, "[a]n opinion so designated shall not be . . . cited by any judge in any trial or appellate court decision . . . except when . . . the opinion is relevant to a criminal, post-conviction or habeas corpus action involving the same defendant." Tenn. R. Sup. C. 4(E)(2).

[4] As noted above in the summary of the facts, the Petitioner was prosecuted in two different trials, and he was represented by different counsel in the two trials. We will refer to the Petitioner's attorney from his first trial as "first trial counsel" and his attorney at his second trial as "second trial counsel."

hearing. The Petitioner also alleged that first trial counsel failed to properly advise the Petitioner that if he testified and opened the door for the State's cross-examination, the Petitioner could be impeached with his prior aggravated assault conviction and that second trial counsel failed to appeal the Petitioner's excessive sentence.

At the post-conviction hearing, the Petitioner testified that his family retained first trial counsel and an investigator, Clark Chapman. He explained that Mr. Chapman investigated his case and spoke with family members of the victims. The Petitioner never spoke with Mr. Chapman, but first trial counsel gave him a copy of Mr. Chapman's investigative report. He stated that Mr. Chapman's report indicated that he had interviewed Callie Redmond, the mother of Mr. Redmond. The report disclosed that Ms. Redmond stated that someone from the District Attorney's Office had told her that Mr. Hall possibly shot Mr. Redmond while Mr. Hall was shooting at the Petitioner. The report also stated that Ms. Redmond was unsure whether Mr. Hall would be charged or whether the case against the Petitioner would proceed. The Petitioner recalled that Ms. Redmond testified at trial, but she did not mention the investigative report; he also noted that first trial counsel did not cross-examine Ms. Redmond. He stated that he primarily met with first trial counsel at his approximately twenty court appearances prior to trial; however, first trial counsel never conveyed a plea offer from the State before the Petitioner set his case for trial. The Petitioner believed that, at trial, first trial counsel would call some of his family members, Mr. Chapman, Lieutenant Wilson, and "people that could have said different things that the [trial] [c]ourt would have known about." The Petitioner found Lieutenant Wilson's report in his discovery pack, and he wanted Lieutenant Wilson to testify at trial because he was a credible witness who would have helped establish that the Petitioner acted in self-defense by testifying that he received "a report that two men w[ere] armed sitting in front of [the Petitioner's] house threatening to kill [his] family and [him]self." It was the Petitioner's understanding, after speaking with first trial counsel, that Lieutenant Wilson would testify at his first trial; however, Lieutenant Wilson did not testify. The Petitioner wanted to assert that he acted in self-defense at trial because during the offense the victims threatened to harm the Petitioner and his family. He also expected his sister, Lakeisha Beasley, to testify at trial. The Petitioner testified that first trial counsel did not discuss with him the notice of enhanced punishment and the motion for consecutive sentencing filed by the State.

The Petitioner testified that, after his case had been set for trial, he realized that the State had offered a sentence of twenty years with a thirty percent release eligibility when he found the paperwork in his "second discovery pack." The Petitioner explained that, after he had set his case for trial, his understanding was that the trial court would no longer accept a plea agreement. The Petitioner testified at his trial, but he explained that he was not aware that his decision to testify could open the door for the State to impeach him on his previous convictions. The Petitioner did not recall any hearing on the issue of

whether the State would be allowed to impeach him on his previous convictions and stated that first trial counsel did not discuss with him the possibility that the State would impeach him if he testified. The Petitioner stated that, if first trial counsel had advised him that the State could impeach him if he testified, then he would not have testified. He stated that, at his first trial, the jury was allowed to deliberate on count 2 after the jury determined it was hung on count 1.

On cross-examination, the Petitioner agreed that he received two discovery packets from first trial counsel. He stated that first trial counsel never informed him of the State's twenty-year plea offer. However, he agreed that he declined a previous offer of a sentence of thirteen and a half years before trial. The Petitioner also agreed that his mother, Rosie Combs, testified at his trial that Mr. Hall argued with her for approximately ten minutes before the offense. He agreed that first trial attorney asked Ms. Combs if Mr. Hall threatened the Petitioner and put him in fear for his life, and Ms. Combs responded that Mr. Hall was screaming and cursing at her. The Petitioner could not recall whether Ms. Combs had given a statement to Lieutenant Wilson. He agreed that his sister, Ms. Beasley, was not an eyewitness to the offense.

The post-conviction court explained to the Petitioner that a hearing on a Tennessee Rule of Evidence 609 evidentiary issue would normally occur during trial but before a defendant testified. The Petitioner stated that he did not recall that at the Rule 609 hearing in his trial, the trial court ruled that the State could not ask the Petitioner about any remote convictions or any convictions that were more prejudicial than probative. He also did not recall that the trial court informed him and first trial counsel that the State could impeach him using his convictions if he opened the door to the issue, such as by testifying that he had never been in trouble. The Petitioner did not recall meeting with first trial counsel after the hearing and during a recess. He agreed that his decision to testify was made voluntarily. He also agreed that, during direct examination, he testified that on the day of the offense, he was headed to a job interview when he felt threatened and that, on cross-examination, the State asked him if he normally carried a gun on job interviews. He agreed that he answered "no" to the State's question and that he explained that he carried a gun because of his previous involvement in a gang. The Petitioner agreed that he testified that he had been a gang member for approximately ten years. He agreed that, when the State asked him if he was involved in violence for ten years, he responded that he was not violent towards anyone. He agreed that the trial court held a jury-out hearing to determine whether the State could then impeach the Petitioner with evidence of his prior conviction for aggravated assault and that the trial court ruled that the State could use the prior conviction for impeachment but not substantive purposes. The Petitioner agreed that during deliberations, the jury asked whether it could deliberate on count 2 because it was deadlocked on count 1. He agreed that, after the jury again asked if it could deliberate on count 2 because it was deadlocked on count 1, first trial

counsel moved for a mistrial, which the trial court initially denied. However, the Petitioner stated that the trial court eventually declared a mistrial as to count 1.

On redirect examination, the Petitioner testified that, after the trial court's ruling on the Rule 609 hearing, first trial counsel did not explain to him what kind of testimony could open the door and allow the State to use his prior conviction for impeachment purposes. He also stated that first trial counsel did not discuss with him whether he should discuss his prior gang affiliation during his testimony.

First trial counsel testified that he had practiced law since 2004 and had practiced exclusively criminal law since 2005. He stated that the Petitioner's mother retained him to represent the Petitioner. He agreed that he met with the Petitioner at court appearances, and he was "trying to resolve the case short of trial because there were . . . proof issues." First trial counsel recalled that the State made "a higher offer in the beginning" but that later, after the Petitioner theorized that Mr. Hall actually shot the deceased victim, the State offered a sentence of thirteen and a half years. He was unsure of when the State offered the sentence of twenty years. He explained that the Petitioner's family retained Mr. Chapman to interview witnesses to help establish the Petitioner's theory of the case, and he noted that Ms. Redmond testified at trial. First trial counsel agreed that he did not cross-examine Ms. Redmond regarding her statement to Mr. Chapman. He explained that Ms. Redmond's statement to Mr. Chapman disclosed that Mr. Redmond had started a feud with the Petitioner over the Petitioner's sister, but he noted that Ms. Redmond's statement was not admissible at trial because it was hearsay. First trial counsel stated that the Petitioner argued at trial that he acted in self-defense, and he agreed that any previous threats against the Petitioner would contribute to the Petitioner's perception during the offense that he was being threatened.

First trial counsel could not recall whether there was information in the discovery on whether Lieutenant Wilson could testify that Mr. Hall had made threats against the Petitioner. He stated that he filed a motion to suppress evidence, a motion for discovery and a motion for the State to disclose the names of witnesses. He agreed that the trial court held a Rule 609 hearing during the first trial on the issue of whether the State could impeach the Petitioner with his prior conviction for aggravated assault and that the trial court ruled that the State could not use the conviction unless the Petitioner opened the door. He could not recall any specific advice he gave to the Petitioner regarding what testimony could open the door for the State. First trial counsel also stated that the trial court held a *Momon* hearing on whether the Petitioner would testify at trial. He stated that he requested a mistrial after the jury indicated to the trial court that it was hung on count 1.

- 12 -

On cross-examination, first trial counsel stated that he believed the State initially offered a twenty-year sentence with thirty percent release eligibility to the Petitioner. He stated that he and the Petitioner discussed the offer, the facts of the case, and possible trial strategies. Both the Petitioner and first trial counsel believed that the plea offer should have a lower sentence, so first trial counsel continued negotiating with the State. He stated that "[a]ny offer that [he] would get [he] [had] to convey to the client." He agreed that he conveyed the State's twenty-year offer to the Petitioner before the case was set for trial. After he continued to negotiate with the State, the State offered the sentence of thirteen and a half years, which he also conveyed to the Petitioner before the case was set for trial. First trial counsel explained that the Petitioner "did not want either of those offers based on what he felt had occurred that day, and things that had led up to that."

First trial counsel testified that Ms. Redmond was the State's first witness at trial. He explained that cross-examining the mother of a deceased victim did not "look[] great in front of the jury[.]" He noted that Ms. Redmond did not observe the offense. He agreed that he called Ms. Combs to testify at trial and that she testified that she and Mr. Hall argued for about ten minutes. He explained that he and Ms. Combs "spoke about everything prior to her testifying," but when she took the stand, he "asked her if she was okay or if she was nervous because it was just almost robotic." He agreed that he tried to get her to testify specifically about whether Mr. Hall threatened her during their ten-minute argument. However, Ms. Combs never testified to anything more specific than the fact that Mr. Hall was screaming and yelling. Therefore, first trial counsel was unable to call Lieutenant Wilson to testify regarding Ms. Combs's prior consistent statement regarding a specific threat. First trial counsel stated that there was another eyewitness to the offense, but he felt that "if [the witness] testified[,] that would [have] severely hurt [the Petitioner]'s case[,]" so he decided against calling the witness at trial. He agreed that he pointed out inconsistencies between the testimonies of the State's witnesses. He stated that he objected throughout trial whenever he felt it was appropriate.

Regarding his advice to the Petitioner after the Rule 609 hearing, first trial counsel stated that he could not "testify to specifics" but that he and the Petitioner discussed what the Petitioner could and could not testify about. He remembered cringing when the Petitioner discussed his prior gang involvement, but he stated that it was the Petitioner's decision on whether to testify. He agreed that, after the Petitioner testified that he had not committed any violent acts during his ten years as a gang member, the trial court held a hearing on whether the Petitioner had opened the door to allow the State to impeach him with his prior convictions. He agreed that he argued that the prior aggravated assault conviction was more prejudicial than probative and that the Petitioner had already informed the jury of his previous gang involvement. However, the trial court ruled that the State could use the prior conviction for impeachment purposes only.

- 13 -

On redirect examination, first trial counsel stated that he was unsure of whether he knew of the Petitioner's gang involvement before the Petitioner's testimony. He explained that he cringed when the Petitioner mentioned his gang involvement because he "couldn't believe that [the Petitioner] would say that after [the trial court] had had that hearing and . . . what did not need to be added into answers so [the Petitioner] wouldn't open up the door." On recross-examination, first trial counsel remembered that he had "very heated conversations" with the prosecutor assigned to the Petitioner's case about the State's initial offer because he believed it was too high. He agreed that he likely reset the Petitioner's case and spoke with the Deputy District Attorney about negotiating a lower plea offer for the Petitioner.

Second trial counsel testified that he had practiced law for over thirty-three years. He stated that he represented the Petitioner during the second trial on the charge of second degree murder and the appeal from the resulting conviction, as well as the Petitioner's appeal from his conviction for attempted second degree murder. He could not recall if the State made any plea offers prior to the Petitioner's second trial. He stated that he began to prepare for the Petitioner's second trial while the Petitioner's appeal from his attempted second degree murder conviction was pending. He recalled reviewing Mr. Chapman's investigative report and the memorandum on Mr. Chapman's conversation with Ms. Redmond. Second trial counsel could not recall whether he or another attorney in his office followed up with the District Attorney's Office to determine who informed Ms. Redmond that Mr. Hall potentially shot Mr. Redmond. He agreed that he did not call Lieutenant Wilson as a witness at the second trial. Second trial counsel stated that he discussed the transcript of the first trial with the Petitioner.

On cross-examination, second trial counsel explained that he did not cross-examine Ms. Redmond regarding her statement to Mr. Chapman because he believed the statement was not admissible, and the cross-examination would not have been "productive because it would [have] been speculative." Regarding the Petitioner's allegation that second trial counsel failed to call Lieutenant Wilson as a witness at trial, he stated that Ms. Combs "was suppose[d] to have made a statement to Lieutenant Wilson at some time or another. And when she was cross-examined during . . . the second trial, [there were] issues that [the District Attorney's Office] w[as] impeaching her on." He agreed that Ms. Combs testified that she argued with Mr. Hall before the shooting occurred and that Ms. Combs did not testify about any specific threat that Mr. Hall made towards her. He stated that, even if Ms. Combs had testified specifically about a threat made by Mr. Hall, he would not have "called Lieutenant Wilson one way or the other[]" because "[t]he proof came in pretty well for [the Petitioner]." He agreed that he called Officer James Patterson to testify for the purposes of impeaching Mr. Hall, who

- 14 -

was the main witness for the State's case. He also agreed that he impeached M.F., who observed the offense, based on some inconsistencies in his prior testimony.

Regarding the Petitioner's allegation that he failed to file pretrial motions, second trial counsel stated that he had obtained the transcript from the first trial as well as discovery from the State. He also filed a motion in limine regarding the Petitioner's gang affiliation and other evidentiary issues and a motion that "requested any exculpatory portions of [Mr.] Hall's statement[.]" He also moved for a judgment of acquittal during the second trial and filed a notice of appeal. He objected throughout trial when he believed it was appropriate, and he "raised a motion in limine regarding the State's question as to how [Mr.] Hall felt when he got shot[.]" He agreed that the State attempted to introduce evidence regarding the Petitioner's conviction of attempted second degree murder from the first trial; however, second trial counsel objected, and the trial court ruled that the conviction was inadmissible. He agreed that the trial court conducted a Rule 609 hearing before the Petitioner called any witnesses. He recalled that he informed the Petitioner that he had the right to testify or not testify and that he discussed the Petitioner's prior gang involvement and the transcript from the first trial with the Petitioner during the *Momon* hearing. He agreed that the Petitioner decided not to testify. Second trial counsel agreed that the jury convicted the Petitioner of voluntary manslaughter, a lesser-included offense of second degree murder.

Second trial counsel agreed that, at the sentencing hearing, he argued that the Petitioner committed the offense "under strong provocation from the proof in the case[]" and that the trial court should not use the Petitioner's remote convictions to order consecutive sentencing. However, the trial court found that the Petitioner was a career criminal and that there were no mitigating factors in the record. Second trial counsel agreed that, if the State had made any plea offers, he would have conveyed the offers to the Petitioner. On redirect examination, he stated that when he takes over a case from another attorney, his normal practice is to ask for that attorney's file and review it. He agreed that Mr. Chapman worked as an investigator in the Petitioner's case with first trial counsel and continued to investigate the Petitioner's case during second trial counsel's representation. Second trial counsel explained that he did not investigate further into Ms. Redmond's statement regarding her son's girlfriend's statement because the statement described how and why Mr. Hall and Mr. Redmond went to Ms. Combs's house, which was not disputed at trial.

Lieutenant Scott Wilson testified that he retired from the Memphis Police Department in September 2006. Lieutenant Wilson stated that he investigated the shooting on Winnona Avenue. When he arrived at the scene of the motor vehicle accident, Lieutenant Wilson observed a vehicle that had hit a utility pole and learned that two shooting victims had been transported to the hospital and that the crime scene unit

had taken photos of the scene of the accident. He contacted the felony response unit to request that the wrecked vehicle be taken to the Memphis Police Department vehicle lot to be processed because it was raining. Lieutenant Wilson then traveled to the location where the shooting had occurred, and he "noticed a person looking out the window at [the officers] as [they were] doing [their] investigation." He and another officer approached the house, knocked on the door, and spoke with the resident, Alice Price. Other officers informed Lieutenant Wilson that the Petitioner's sister, Ms. Beasley, told the officers that she had been in a domestic dispute with Mr. Hall before the offense. Lieutenant Wilson did not recall if he or any other officer followed up with Ms. Beasley about that statement. He stated that officers were originally called to the scene because they learned a woman's ex-boyfriend was armed with a pistol at the house and was threatening the woman and her mother. After officers were already in route to the scene at the house on Winnona, officers received a second call informing them that a vehicle had hit a utility pole and two victims had been shot.

On cross-examination, Lieutenant Wilson stated that when he arrived at the scene of the shooting, he only spoke with Ms. Price and her grandson, M.F. Ms. Price informed him that she did not observe the shooting because she was disabled and her eyesight was poor, but she stated that she heard gunshots. When Lieutenant Wilson asked M.F. "if he knew who had the pistol[,]" M.F. pointed in the direction of Ms. Combs's house and stated that the shooter lived in that house and that he occasionally played football with M.F. After clearing the scene of the shooting, Lieutenant Wilson composed his incident report and completed his investigation.

In its order denying the petition for post-conviction relief, the post-conviction court found that first trial attorney filed pretrial motions including a motion seeking discovery of *Brady* material, "which would include all impeachable records of State's witnesses." The post-conviction court noted that the Petitioner was not entitled to discover arrest records and found that the Petitioner failed to present proof "that there existed any witness arrest record that might have been used to the [P]etitioner's benefit, had it been discovered." The post-conviction court concluded that the Petitioner failed to establish that first trial counsel's performance was deficient or that the Petitioner had suffered prejudice on this ground. The post-conviction court also found that first trial counsel filed a motion for disclosure of statements made by any State witnesses. The post-conviction court concluded that other motions that the Petitioner asserted that first trial counsel should have filed, such as a motion in limine excluding the Petitioner's non-remote convictions or a motion for a bill of particulars, would have been denied as frivolous if first trial counsel had filed them.

The post-conviction court found that first trial counsel moved for a mistrial after the jury informed the trial court that it could not arrive at a unanimous decision on count

1. The post-conviction court found that "[a]ny further objection or additional motion for mistrial would have been denied[]"; therefore, the Petitioner failed to establish that he was prejudiced by first trial counsel's decision to not renew his motion for mistrial after the jury was allowed to deliberate on count 2. The post-conviction court found that there were no "weaknesses in the State's case that went unchallenged." Regarding the Petitioner's allegation that first and second trial counsel should have called Ms. Beasley, Ms. Combs, Lieutenant Wilson, and the Petitioner's niece to testify, the post-conviction court noted that Ms. Combs testified at both trials. The post-conviction court found that neither Ms. Beasley nor the Petitioner's niece testified at the post-conviction hearing; therefore, the Petitioner could not establish that he was prejudiced on this ground. Regarding Lieutenant Wilson, the post-conviction court noted that Lieutenant Wilson's incident report was admitted into evidence at the post-conviction hearing, but if Lieutenant Wilson had been called to testify at either of the trials, "any testimony he gave would have been hearsay, and ruled inadmissible." Therefore, the post-conviction court concluded that the Petitioner had failed to establish that first or second trial counsel's decision to not call Lieutenant Wilson was deficient and that the Petitioner had failed to establish that he was prejudiced by these decisions.

Regarding the Petitioner's claim that first and second trial counsel failed to object to discrepancies in the State's proof, the post-conviction court found that "[i]f there [had] been any discrepancies in the State's proof, that would not have been a matter to which a defense attorney would ever object." The post-conviction court concluded that this allegation was unmeritorious. Regarding the Petitioner's assertion that first and second trial counsel failed to raise an objection under *Blakely v. Washington*, 542 U.S. 296 (2004), the post-conviction court noted that the Petitioner's offenses occurred on September 10, 2006, but the precedent set by *Blakely* applied "only to offenses occurring prior to June 7, 2005[.]" Regarding the Petitioner's claim that first and second trial counsel failed to cross-examine Ms. Redmond, the post-conviction court found that first and second trial counsel "testified that any statement that [Ms. Redmond] was under the impression [that] was made to her by a prosecutor would be inadmissible hearsay" and noted that first and second trial counsel did "not want to cross-examine her about something that would be objected to and not be admitted right after she had testified about losing her son[.]" The post-conviction court concluded that the Petitioner was not entitled to relief on this ground.

Regarding the Petitioner's claim that first trial counsel failed to properly advise the Petitioner about the possible consequences of opening the door to the State's impeachment on his prior aggravated assault conviction, the post-conviction court noted that, on direct appeal, this court concluded that the Petitioner's testimony "placed his allegedly nonviolent character as an issue before the jury[]" and that "the State was free to introduce his prior conviction for aggravated assault." *See Michael Clark (Clark I)*,

2011 WL 300211, at *4. The post-conviction court found that first trial counsel "had no recollection of what he and the [P]etitioner discussed immediately after the Tenn. R. Evid. 609 hearing" but noted that first trial counsel testified that he would have discussed with the Petitioner areas of testimony that the Petitioner should not "get into." The post-conviction court concluded that the Petitioner failed to establish "by clear and convincing evidence that he was prejudiced by any deficient performance of [first trial] counsel[]" and that "if there had been any prejudice suffered by the [P]etitioner, it resulted from his own fault in committing easily impeachable perjury during his cross-examination, thus opening the door for the conviction."

The post-conviction court found that the Petitioner failed to present any proof regarding first and second trial counsel's arguments at his sentencing hearings. Regarding the Petitioner's claim that second trial counsel failed to raise on appeal the argument that his sentence was excessive, the post-conviction court found that "the sentence given [to] the [P]etitioner from his first trial was fully justified and that any appeal of the [P]etitioner's sentence would not have resulted in any sentence reduction." The post-conviction court concluded that the Petitioner had failed to establish he was prejudiced on this ground because his sentence was not excessive. The post-conviction court noted that, at the post-conviction hearing, the Petitioner raised an additional ground that he did not include in his petition: that first trial counsel failed to convey the State's plea offer for a sentence of twenty years with release eligibility after service of thirty percent of the sentence until after the Petitioner had set his case for trial. The post-conviction court noted that the trial court had transcribed the "voire dire of the [P]etitioner when he requested a trial[,]" which "reflect[ed] that no settlement offer was ever discussed during the voir dire of the [P]etitioner, by either [first] trial [counsel] or [the trial] court . . . ." The post-conviction court found that first trial counsel "conveyed all offers to the [P]etitioner at the time he committed himself to trial . . . ." The post-conviction court also concluded that "[a]ll of the witnesses were effectively cross-examined in each trial, [first and second trial counsel] were well-prepared with full discovery, all functioned effectively as counsel and the [P]etitioner received two fair trials." The Petitioner appealed the post-conviction court's denial of relief.

## II. Analysis

The Petitioner argues that he received ineffective assistance of counsel from first trial counsel and second trial counsel because (1) first trial counsel failed to properly advise the Petitioner regarding the admission of his prior aggravated assault conviction for impeachment purposes, (2) first trial counsel did not review the State's sentencing motions with the Petitioner, (3) first and second trial counsel failed to call Lieutenant Wilson to testify; and (4) first and second trial counsel failed to properly cross-examine Ms. Redmond. The State responds that the Petitioner's claims regarding first trial

counsel are improperly before this court because the Petitioner raised claims from both trials in a single petition and because the statute of limitations for the Petitioner's claims against first trial counsel has expired. Alternatively, the State argues that the Petitioner received effective assistance of counsel.

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Timeliness of the Post-Conviction Petition*

The State contends that a petitioner must raise claims from two trials in separate post-conviction petitions, even if the charges in the two trials originated from a single indictment. The State also argues that the Petitioner has waived this court's consideration of his claims against first trial counsel because "he failed to properly raise that claim in a separate, timely filed petition for post-conviction relief challenging the conviction that arose from the first trial." The Petitioner did not address this issue in his appellate brief.

The Post-Conviction Procedure Act states the following:

[A] person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred.

Tenn. Code Ann. § 40-30-102(a).  Pursuant to Tennessee Code Annotated section 40-30-102(b), a court does not have jurisdiction to consider a petition for post-conviction relief filed outside the one-year statute of limitations unless:

> (1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required.  The petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;
>
> (2) The claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or
>
> (3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the petition must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid.

Tenn. Code Ann. § 40-30-102(b).  Additionally, Tennessee courts "have previously recognized that in certain circumstances, strict application of the statute of limitations would deny a defendant a reasonable opportunity to bring a post-conviction claim and thus, would violate due process." *Williams v. State*, 44 S.W.3d 464, 468 (Tenn. 2001).  When a petitioner fails to timely file a petition for post-conviction relief due to circumstances outside of his control, due process requires tolling of the statute of limitations.  *Id.* at 468-69.  Due process concerns may toll the statute of limitations when the petitioner is mentally incompetent or if the petitioner's trial counsel misrepresented to the petitioner that trial counsel was still representing the petitioner, thereby precluding the petitioner from filing a pro se petition for post-conviction relief.  *Id.* at 469 (citing *Seals v. State*, 23 S.W.3d 272, 279 (Tenn. 2000)).

A petition for post-conviction relief "shall be limited to the assertion of claims for relief from the judgment or judgments entered in a single trial or proceeding.  If the petitioner desires to obtain relief from judgments entered in separate trials or proceedings, the petitioner must file separate petitions."  Tenn. Code Ann. § 40-30-104(c).

The Petitioner desires relief from judgments entered in two different trials, therefore, under Tennessee Code Annotated section 40-30-104(c), he was required to file a separate petition for post-conviction relief for each judgment. The Tennessee Supreme Court denied the Petitioner's application to appeal this court's decision in *Clark I* on May 25, 2011; therefore, the Petitioner had one year from this date to file a petition for post-conviction relief relating to this proceeding and resulting conviction. The Petitioner filed his petition for post-conviction relief on June 6, 2013, over a year after the statute of limitations expired for a petition for post-conviction relief from the judgments entered from the first trial. The Petitioner does not allege and there is no evidence in the record that the Petitioner's claims regarding first trial counsel's performance are "based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial," "based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted[,]" or that the claims "seek[] relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid[.]" *See* Tenn. Code Ann. § 40-30-102(b). Moreover, the Petitioner does not allege that he is entitled to due process tolling. Although it appears from the record that the State did not assert that the claims relating to the Petitioner's first trial were time-barred before the post-conviction court, this court has previously concluded that "the language of the post-conviction statute confers jurisdictional import to the timely filing of a petition, and this court must resolve the question of timeliness before any adjudication on the merits may properly occur." *Terrance D. Nichols v. State,* No. W2009-00590-CCA-R3-PC, 2010 WL 669225, at *4 (Tenn. Crim. App. Feb. 25, 2010) (quoting *Nathaniel Morton Champion v. State,* No. M2008-01821-CCA-R3-PC, 2009 WL 3400679, at *5 (Tenn. Crim. App. Oct. 20, 2009)). "Moreover, the statute of limitations for filing a post-conviction petition is not an affirmative defense which the State must assert." *Id.* (quoting *State v. Nix,* 40 S.W.3d 459, 464 (Tenn. 2001)). Because the petition as it relates to the Petitioner's first trial is untimely and due process considerations do not require tolling of the statute of limitations, we do not have jurisdiction to consider the claims relating to first trial counsel and the Petitioner's claims relating to first trial counsel are dismissed.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same

standard for ineffective assistance of counsel applies in both federal and Tennessee cases).  Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).  Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor.  *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)).  Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579.  We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision.  *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases."  *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369.  In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense.  *Goad*, 938 S.W.2d at 370.  Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to call Lieutenant Wilson*

The Petitioner contends that second trial counsel's performance was deficient because he failed to call Lieutenant Wilson to testify at trial.  The Petitioner argues that, if Lieutenant Wilson had testified at trial, his testimony would have helped establish the Petitioner's defense of self-defense because Lieutenant Wilson would testify that he received a report that two armed men were threatening to kill the Petitioner and his family.  Lieutenant Wilson testified at the post-conviction hearing that officers were originally called to the scene because someone reported that a woman's ex-boyfriend was armed with a pistol and was threatening the woman and her mother.  Lieutenant Wilson's incident report was admitted into evidence at the post-conviction hearing.  The post-

conviction court found that if Lieutenant Wilson had been called to testify at either of the trials, his testimony would probably have been hearsay and inadmissible. The post-conviction court concluded that the Petitioner failed to establish that second trial counsel's performance was deficient or that he was prejudiced by second trial counsel's performance in this regard.

Second trial counsel testified that, even if Ms. Combs had testified specifically about the victim's threats, he would not have called Lieutenant Wilson because "[t]he proof came in pretty well for [the Petitioner]." Second trial counsel's decision to not call Lieutenant Wilson was a reasonable part of his trial strategy because Ms. Combs through her testimony established the Petitioner's self-defense theory—that she felt threatened by Mr. Hall and that Mr. Hall threatened the Petitioner. Therefore, we will not second-guess second trial counsel's decision. *Granderson*, 197 S.W.3d at 790. Second trial counsel's decision to not call Lieutenant Wilson was not deficient and the Petitioner is not entitled to relief on this ground.

### *Failure to properly cross-examine Ms. Redmond*

The Petitioner argues that second trial counsel's decision to not cross-examine Ms. Redmond was deficient and that he was prejudiced by this decision. Second trial counsel testified that he did not cross-examine Ms. Redmond regarding her statement to Mr. Chapman because he believed the statement was not admissible and that the cross-examination would not have been "productive because it would [have] been speculative." The post-conviction court found that second trial counsel testified that Ms. Redmond's testimony regarding what she may have heard from the District Attorney's Office "would [have] be[en] inadmissible hearsay" and noted that second trial counsel did "not want to cross-examine her about something that would be objected to and not be admitted right after she had testified about losing her son[.]" Although the post-conviction court did not make specific credibility findings, the post-conviction court impliedly credited the testimony of second trial counsel based on its factual findings.

It appears that the Petitioner wanted Ms. Redmond to testify regarding a statement she made to Mr. Chapman, *i.e,* that someone from the District Attorney's Office informed her that Mr. Redmond was possibly shot by someone other than the Petitioner. We agree with the post-conviction court's conclusion that second trial counsel's decision to not cross-examine Ms. Redmond was not deficient and that the testimony would have likely been excluded as inadmissible hearsay. *See* Tenn. R. Evid. 802. The Petitioner is not entitled to relief on this ground.

Because the Petitioner has failed to establish that second trial counsel's performance was deficient or that he was prejudiced by second trial counsel's performance, we conclude that the Petitioner is not entitled to post-conviction relief.

## III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed, in part. We dismiss the portion of the appeal challenging the Petitioner's conviction from his first trial for lack of jurisdiction.

_____
ROBERT L. HOLLOWAY, JR., JUDGE